UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CLYDE CURLEE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:17-cv-01347 |
| ) | Judge Aleta A. Trauger |
| LEWIS BROTHERS BAKERIES ) | |
| INCORPORATED OF TENNESSEE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Lewis Brothers Bakeries Incorporated of Tennessee ("Lewis Brothers") has filed a Motion for Summary Judgment (Docket No. 22), to which Clyde Curlee has filed a Response (Docket No. 25), and Lewis Brothers has filed a Reply (Docket No. 28). For the reasons set out herein, Lewis Brothers' motion will be denied.

## I. BACKGROUND

Curlee worked in various positions for Lewis Brothers, a commercial bakery, from March 14, 2000, until October 5, 2016. (Docket No. 29 ¶ 1.) He was covered by a Collective Bargaining Agreement ("CBA") between Lewis Brothers and the Bakery, Confectionary, Tobacco Workers and Grain Millers International Union of America, Local Number 280 ("BCTGM"). (Docket No. 23-4 at 1.) The CBA reserved to Lewis Brothers the "right to . . . discharge [an employee] for proper cause" and the "right to establish rules pertaining to the . . . permissible conduct of employees." (*Id.* at 3.) As an addendum to the CBA, Lewis Brothers and the BCTGM adopted a memorandum of understanding setting forth a point-based absenteeism policy. (*Id.* at 24.) An employee is given 5 points for every time he is tardy or leaves early; 10 points for any absence other than one involving a work-related injury, disability, or FMLA leave; 15 points if the

aforementioned absence is on the first scheduled day of the workweek; and 25 points for an absence without notice. An employee receives disciplinary write-ups at 25, 50, and 75 points, and he will be terminated at 100. (Docket No. 29 ¶¶ 6–8.) Points, however, eventually "roll off" an employee's record over time. (*Id.* ¶ 45.) Lewis Brothers concedes that it will sometimes rehire an employee after the employee has faced automatic termination because he hit 100 points. (*Id.* ¶ 9.) Since 2016, Lewis Brothers has rehired at least 18 employees who were originally terminated for reaching 100 points. (*Id.* ¶ 56.)

In August or September 2016, Curlee was diagnosed with prostate cancer by Dr. Gregory Stewart. (*Id.* ¶ 13.) At the time, he had 95 points under the attendance policy. (Docket No. 26 ¶ 5.) On September 12, 2016, Curlee spoke with Lewis Brothers human resources manager Heather Kraemer-Stephens and informed her that (1) he would be leaving work early that day and (2) he anticipated that he would need to take leave for cancer treatment. Kraemer-Stephens gave Curlee a blank medical certification form in order to qualify for leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et seq.*, and Curlee left for the day. (Docket No. 29 ¶¶ 13–16; Docket No. 25 ¶ 6.) Curlee testified, in his deposition, that he was "hurting down below" at the time, although he was unsure if it was due to the prostate cancer or an injury. (Docket No. 23-3 at 90.) Kraemer-Stephens "conditionally approved" the early departure as FMLA leave. (Docket No. 25 ¶ 9.) At some point shortly thereafter—although Curlee does not remember the exact date—Curlee dropped the paperwork off at Dr. Stewart's office. (Docket No. 23-3 at 71; Docket No. 29 ¶ 17.)

On September 19, 2016, however, Curlee met with another physician, Dr. Joseph Smith, regarding his cancer treatment. His attendance records suggest that he left work early on September 19, which appears to correspond with the Dr. Smith appointment. (Docket No. 25-5 at

1; Docket No. 29 ¶ 18.) As part of the meeting, Curlee concluded that Dr. Smith, not Dr. Stewart, would be overseeing his cancer treatment. (Docket No. 29 ¶ 21; Docket No. 23-3 at 112.)

On September 20, 2016, Curlee returned to work and again met with Kraemer-Stephens. He informed Kraemer-Stephens that Dr. Smith would be overseeing his treatment and gave Kraemer-Stephens an index card with Dr. Smith's contact information. Kraemer-Stephens then allegedly told Curlee that she would "take care of" the medical certification form. (Docket No. 29 ¶¶ 25, 28; Docket No. 23-3 at 110–11.) Lewis Brothers argues that Kraemer-Stephens meant only that she would "take care of" faxing the form to Dr. Smith and that Curlee was ultimately still responsible for obtaining the completed form. (Docket No. 29 ¶ 28.)

The FMLA certification form at issue is a standard form promulgated by the U.S. Department of Labor's Wage and Hours Division and adopted (or not adopted) voluntarily by employers. (Docket No. 25-4.) It contains a section of "INSTRUCTIONS to the EMPLOYEE," explaining that "[f]ailure to provide a complete and sufficient medical certification may result in a denial of your FMLA request" and "[y]our employer must give you at least 15 calendar days to return this form." (*Id.* at 1.) Kraemer-Stephens faxed the form to Dr. Smith on September 22, 2016. (Docket No. 25-7.) She wrote, to Dr. Smith's office, "The doctor and Clyde will need to complete the forms and return [them] to me . . . ." (*Id.*)

Curlee continued to work until, on October 4, 2016—Curlee's day off—Kraemer-Stephens informed him that he was terminated for reaching 100 points. She instructed him to come in to work the next day to speak with plant manager Kenny Burkhart about the situation. (Docket No. 29 ¶¶ 33–35.) On October 5, 2016, Curlee—realizing that his FMLA certification form had never been submitted and that that deficiency had contributed to his being assessed absence points—contacted Dr. Smith's office and requested that Dr. Smith complete the form as

3

soon as possible. (*Id.* ¶ 38.) Meanwhile, Curlee met with Burkhart, who confirmed that Curlee had been terminated because of his lack of FMLA certification. Curlee responded that he had thought that Dr. Smith had completed and returned the form already. Curlee was given a termination notice that identified him as eligible for rehire. (*Id.* ¶¶ 40–43.)

The same day, Dr. Smith returned the completed form. On it, he noted that Curlee had seen him on September 19, 2016, for a consultation. (Docket No. 23-4 at 82; Docket No. 29 ¶ 44.) In the form's "PART B – AMOUNT OF LEAVE NEEDED" section, Dr. Smith indicated that Curlee would need leave for a date range of November 2, 2016—the day before his upcoming scheduled surgery—to December 19, 2016. (Docket No. 23-4 at 82–83.) On October 11, 2016, Kraemer-Stephens informed Curlee, now terminated, that the company had received his FMLA certification form, filled out and signed by Dr. Smith. She pointed out, however, that the form did not address the September 12, 2016 absence. Kraemer-Stephens did not offer Curlee the opportunity to amend the form. (*Id.* ¶¶ 46–48.)

Curlee expressed a desire to be rehired, and Kraemer-Stephens again instructed him to come in and meet with Burkhart. (*Id.* ¶¶ 49–50.) Curlee did so, but Burkhart declined to rehire Curlee, giving him no reason for the decision. (*Id.* ¶¶ 51–54.) Lewis Brothers now maintains that Curlee was not rehired due to "poor attendance, his history of altercations with his peers, and the inconsistency in his performance and attitude throughout the course of his employment." (*Id.* ¶ 62.) Curlee had had heated workplace conflicts with coworkers in 2011, 2012, and 2015. (*Id.* ¶ 66; *see also* Docket Nos. 23-2 & -3 at 56–63.) The record includes disciplinary writeups for the 2011 and 2012 incidents. They describe Curlee as shouting and behaving in a "threatening and intimidating manner" but do not describe any physical violence. (Docket No. 23-4 at 65–66.)

Curlee's attendance records confirm that he first reached the 100-point threshold due to his early departure on September 12, 2016, assuming that one counts the 5 points assessed for that day. (Docket No. 25-5 at 1.) At some point thereafter, however, 5 points rolled off his record, putting him back down to 95. His early departure of September 19, 2016, if counted, returned him to 100 points. (Docket No. 25-5 at 1.) Lewis Brothers concedes that, if Curlee had not been terminated when he was, 50 points would have rolled off his record in two weeks. (Docket No. 29 ¶ 45.)

On October 4, 2017, Curlee filed his Complaint in this case. (Docket No. 1.) He pleads three causes of action: Count I is for violation of the FMLA; Count II is for violation of the Americans with Disabilities Act ("ADA"); and Count III is for violation of the Tennessee Disability Act ("TDA").

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

### III. ANALYSIS

**A. FMLA**

The FMLA entitles eligible employees to take up to twelve weeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Employees who return to work within the twelve-week statutory period are entitled to return to their previous position or an equivalent position. *Id.* § 2614(a)(1). "An employer violates the FMLA when it 'interfere[s] with, restrain[s], or den[ies] the exercise of or the attempt to exercise' FMLA rights." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014) (quoting 29 U.S.C. § 2615(a)(1); citing *Bryson v. Regis Corp.*, 498 F.3d 561, 569–70 (6th Cir. 2007)). The FMLA also prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" under the FMLA. 29 U.S.C. § 2615(a)(2).

The Sixth Circuit recognizes two distinct theories for recovery under the FMLA: "(1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Killian v. Yorozu*

*Auto. Tenn., Inc.*, 454 F.3d 549, 555–56 (6th Cir. 2006) (quoting *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). Regarding these claims, the Sixth Circuit has stated:

> Although . . . a claim for retaliatory discharge is cognizable under either theory, the requisite proofs differ. The interference theory has its roots in the FMLA's creation of substantive rights, and if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred, regardless of the intent of the employer. The central issue raised by the retaliation theory, on the other hand, is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.

*Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012) (internal citations and quotation marks omitted).

Curlee alleges both interference and retaliation. (Docket No. 1 ¶¶ 53–62.) An employee may prove either FMLA interference or retaliation using the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), although the particular elements of the prima facie case under each theory differ. *Demyanovich*, 747 F.3d at 427; *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). "[T]he employee has the initial burden of establishing his prima facie case; if he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual." *Demyanovich*, 747 F.3d at 427.

### 1. Interference

To establish a prima facie case of FMLA interference under § 2615(a)(1), the plaintiff must demonstrate that (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the plaintiff was entitled to leave under the FMLA; (4) he gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled. *Killian*, 454 F.3d at 556 (citing *Walton v. Ford Motor Co.*,

424 F.3d 481, 485 (6th Cir. 2005)). Lewis Brothers argues that Curlee cannot establish his prima facie case, because Curlee was terminated for his absence on September 12, 2016—a date for which he never obtained an FMLA medical certification and for which he was, therefore, not entitled to leave, as required for the third and fifth elements of the prima facie case. It is undisputed that the mere fact that an employee is entitled to some FMLA leave does not preclude his employer from terminating him for unrelated absenteeism. *See, e.g.*, *Perry v. Am. Red Cross Blood Servs.*, 651 F. App'x 317, 328 (6th Cir. 2016).

"FMLA regulations . . . explicitly permit[] employers to condition FMLA-protected leave upon an employee's compliance with the employer's usual notice and procedural requirements, absent unusual circumstances." *Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 614 (6th Cir. 2013) (citing 29 C.F.R. § 825.302(d)). "Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied." 29 C.F.R. § 825.302(d). By extension, if an employee fails to comply with the employer's usual and customary requirements and there is no unusual situation justifying that departure, the employer may terminate the employee for taking leave days, "even if the days he failed to [notify the employer about] were otherwise FMLA-protected." *Stein v. Atlas Indus., Inc.*, 730 F. App'x 313, 317 (6th Cir. 2018) (citing *Srouder*, 725 F.3d at 615).

The evidence is sufficient to establish that Curlee initially informed Lewis Brothers that he intended to use FMLA leave, including for September 12 and 19. The FMLA, however, permits an employer to require more than bare notice of intent to take leave. In particular, FMLA regulations permit an employer to require that an employee's leave request be "supported by a certification issued by the health care provider of the employee." 29 C.F.R. § 825.305(a). "The

employee must provide the requested certification to the employer within 15 calendar days after the employer's request, unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts or the employer provides more than 15 calendar days to return the requested certification." 29 C.F.R. § 825.305(b). If the leave requested was unforeseeable, the 15-day period may be extended "due to extenuating circumstances." 29 C.F.R. § 825.313(b). "[T]he failure to provide a medical certification is an independent basis for denying FMLA leave notwithstanding the appropriateness of that leave." *Kinds v. Ohio Bell Tel. Co.*, 724 F.3d 648, 654 (6th Cir. 2013). Lewis Brothers argues that, while Curlee did eventually obtain a medical certification, that certification was deficient in two ways: first, Lewis Brothers did not receive the certification until October 5, 2016, despite its having been due on September 27, 2016; and, second, the medical certification made no mention of the September 12 absence.

With regard to the timeliness of his certification, Curlee argues that his decision to change doctors, combined with his good-faith efforts to obtain his certification and Kraemer-Stephens' representation that she would "take care of" the form, should be held to have tolled the 15-day deadline for obtaining his medical certification. In the alternative, he argues that Kraemer-Stephens' statement should equitably estop Lewis Brothers from relying on that deadline. *See Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 556 (6th Cir. 2009) (acknowledging the applicability of "equitable estoppel in the FMLA context"). Lewis Brothers argues that Kraemer-Stephens merely meant that she would "take care of" faxing the form. How a reasonable person would have taken that statement, however, is a question of fact. Generally speaking, "taking care of" a required form does not mean faxing it and forgetting about it. Given that the record would allow a fact finder to conclude that Curlee reasonably relied on Kraemer-

9

Stephens to obtain the certification, he may be entitled to rely on equitable tolling or estoppel. Moreover, as a third ground for allowing Curlee to file the certification after September 27, Kraemer-Stephens' statement could also be construed as an employer-approved extension, as permitted by 29 C.F.R. § 825.305(b). *See Frazier v. Honda of Am. Mfg., Inc.*, 431 F.3d 563, 566 (6th Cir. 2005) (recognizing that employer's actions amounted to an extension of the certification deadline, despite not having been explicitly characterized as such). If Curlee reasonably believed that Kraemer-Stephens would, as she stated, "take care" of the form, he also could have reasonably inferred that Lewis Brothers would not punish him if she, as the company's agent, failed to do so in time. Lewis Brothers, therefore, is not entitled to summary judgment merely because the certification was untimely.

With regard to his alleged failure to obtain a certification covering September 12, 2016, Curlee argues that Lewis Brothers was required to give him written notice and an opportunity to rectify the omission before it could terminate him. The FMLA and supporting regulations do not put the onus entirely on the employee to make sure that his paperwork is perfect on the first attempt. Rather, FMLA regulations provide that, once the employee has informed the employer of his intent to take leave, the employer "should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." 29 C.F.R. § 825.302(c). While the employer has the right, if it so elects, to require a medical certification, an employer that receives a certification that it considers "incomplete or insufficient" must "state in writing what additional information is necessary to make the certification complete and sufficient" and then allow the employee "seven calendar days (unless not practicable under the particular circumstances despite the employee's diligent good faith efforts) to cure any such deficiency." 29 C.F.R. § 825.305(c).

10

"[A] failure to notify an employee of the specific deficiency in an FMLA medical certification form constitutes interference if it results in the denial of the employee's request for protected leave." *Alcala v. Best Buy Stores, LP*, No. EDCV 11-00798-JVS, 2012 WL 6138332, at *13 (C.D. Cal. Nov. 7, 2012) (citation omitted).

Lewis Brothers argues that Curlee's medical certification was not "incomplete or insufficient," but rather a complete, sufficient medical certification that simply did not cover September 12. "A certification is considered incomplete if the employer receives a certification, but one or more of the applicable entries have not been completed. A certification is considered insufficient if the employer receives a complete certification, but the information provided is vague, ambiguous, or non-responsive." 29 C.F.R. § 825.305(c).

Lewis Brothers is correct that the certification may have seemed clear and complete on its face, in that the relevant portions of the form had indeed been filled out. The certification form, however, was not obtained or completed in a vacuum. Lewis Brothers was aware that Kraemer-Stephens had left early on September 12 and that the departure may have been cancer-related. Indeed, Lewis Brothers had already conditionally approved the leave as such. In context, therefore, it can be argued that "one . . . of the applicable entries ha[d] not been completed," rendering the certification "incomplete." *Id.* Nevertheless, even if one disputes that the certification was "incomplete," it can "fairly be characterized as 'insufficient'" on the ground that it was "non-responsive as to whether [the employee] was incapacitated during the period for which []he sought leave." *Swegan v. Shepherd of the Valley Lutheran Ret. Servs., Inc.*, No. 4:11CV02179, 2013 WL 1284309, at *7 (N.D. Ohio Mar. 25, 2013). Accordingly, Lewis Brothers had an obligation to give Curlee written notice and allow him the opportunity to cure

the omission. It did not, instead merely holding the form for several days before informing Curlee of the form's receipt but offering no opportunity to amend.[1]

The FMLA regulations envision a cooperative process that balances an employee's entitlement to leave with the employer's legitimate interest in performing an informed review of the employee's request. Both parties have responsibilities in that process, and it is explicitly designed not to have an employee's rights extinguished merely because he failed to provide everything necessary up front or did not check every required box on the first try. While Lewis Brothers was within its rights to demand documentation for Curlee's September 12 leave, compliance with the regulations is a two-way street. An employer cannot "deny leave on the basis of an insufficient certification without adhering to the procedure set forth in 29 C.F.R. § 825.305(c)." *Swegan*, 2013 WL 1284309, at *7. Lewis Brothers terminated Curlee when he still had a live right to amend his paperwork and demonstrate his entitlement to the requested leave. He has, moreover, presented evidence sufficient for a jury to infer that he would have been entitled to the leave if given the chance to cure the deficiencies in his paperwork. Curlee, accordingly, has made out his prima facie case of interference.

---

[1] Lewis Brothers argues that the Sixth Circuit's opinion in *Brenneman v. MedCentral Health System*, 366 F.3d 412, 425 (6th Cir. 2004), establishes that Lewis Brothers had no obligation to allow Curlee the opportunity to cure his certification. In that case, the Sixth Circuit held that the denial of FMLA leave was permissible because, among other things, the "medical certification that plaintiff provided was insufficient on its face." *Id.* at 428. At the time, however, 29 C.F.R. § 825.305 required an opportunity to cure only for incomplete, but not insufficient, certifications. *See* 29 C.F.R. § 825.305(d) (2004). The regulation, moreover, did not include the express definition of "incomplete" currently in force. *Id.*; *see* The Family and Medical Leave Act of 1993, 73 Fed. Reg. 67934-01 (Nov. 17, 2008) ("Proposed § 825.305(c) added definitions of incomplete and insufficient certifications and set forth a procedure for curing an incomplete or insufficient certification that requires an employer to notify the employee in writing as to what additional information is necessary for the medical certification and provide seven calendar days to provide the additional information."). *Brenneman*, therefore, is of little help in construing Lewis Brothers' obligations under the current regulations.

*2. Retaliation*

To establish a prima facie case of FMLA discrimination/retaliation under § 2615(a)(2), the plaintiff must show that (1) he was engaged in an activity protected by the FMLA; (2) the employer knew that he was exercising his rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Killian*, 454 F.3d at 556 (citing *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003)). Regardless of any issues with the paperwork surrounding his September 12, 2016 absence, it is clear that Curlee did engage in a protected activity in requesting FMLA leave regarding his cancer. After that request, he (1) was terminated and (2) was not rehired, despite the fact that many others who had violated the same policy were offered their positions back. Lewis Brothers argues, however, that Curlee cannot satisfy the prima facie case for retaliation because he cannot establish causation between his request and his termination/the decision not to rehire him.

The Sixth Circuit has held that, "where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 451 (6th Cir. 2017) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)). Temporal proximity is calculated based on the amount of "time after an employer learns of a protected activity" before taking the adverse employment action. *Id.* at 452 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). Lewis Brothers learned about Curlee's leave plans on September 12, 2016. He was terminated slightly over three weeks later, on October 4, 2016. Moreover, there is reason to think that, even those three weeks

may overstate the amount of delay in Lewis Brothers' decision. Until Curlee failed to obtain paperwork covering his September 12, 2016 absence, Lewis Brothers lacked an excuse to fire him under the CBA. Once the company was permitted to fire him for reaching 100 points, it almost immediately did so.

The Sixth Circuit has recognized that temporal proximity of a few weeks, or even two or three months, is sufficient to establish an initial inference of causation. *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776–77 (6th Cir. 2018) (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283–84 (6th Cir. 2012) (collecting cases)). The court, moreover, sees nothing in the totality of the circumstances surrounding Lewis Brothers' decision that would undermine such an inference. *See Johnson v. Donahoe*, 642 F. App'x 599, 607 (6th Cir. 2016) ("In analyzing the facts in temporal proximity cases, we have always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn.") (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010)). Lewis Brothers points out that some cases have suggested that the court's ability to infer causation from temporal proximity is lessened where an employee was allegedly terminated for disciplinary reasons. *See, e.g.*, *Montell v. Diversified Clinical Servs.*, Inc., 757 F.3d 497, 507 (6th Cir. 2014). The force of that argument is considerably weaker here, however, where Lewis Brothers itself contributed to the supposed triggering event, first by telling Curlee that it would "take care of" his certification form and then by depriving him of his legally protected right to amend the insufficient form. Moreover, that line of cases is founded, in part, on the fear that an employee facing impending discipline will "see the proverbial writing on the wall" and manufacture a protected activity in order to protect himself—for example, by filing a discrimination claim. *Id.* That concern has little, if any, weight in a case such as this one; the court is confident that Curlee did not develop prostate cancer to

avoid discipline for absenteeism. The temporal proximity between Curlee's leave requests and his termination, both alone and in the context of the totality of the evidence, supports an inference of causation. Curlee, accordingly, has made out his prima facie case of retaliation.

### *3. Pretext*

Lewis Brothers argues next that it has proffered legitimate, non-discriminatory reasons for both Curlee's termination and the decision not to rehire him, and Curlee cannot establish that those reasons are pretextual. With regard to his termination, the proffered legitimate, non-discriminatory reason was Curlee's accrual of 100 points under the absenteeism policy. With regard to the failure to rehire, the proffered reason is some combination of Curlee's history of conflicts with coworkers and his history of attendance issues.

To establish pretext, a plaintiff can show that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the adverse action; or (3) were insufficient to explain the adverse action. *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc)). A plaintiff must produce "sufficient evidence from which the jury could reasonably reject [the employer's] explanation and infer that . . . the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001) (citations and internal quotations marks omitted). "In keeping with the burden required at the summary judgment stage, a plaintiff 'need only identify genuine disputes of material fact regarding the legitimacy of the defendant's stated reasons.'" *Kirkland v. James*, 657 F. App'x 580, 586 (6th Cir. 2016) (quoting *Wheat*, 785 F.3d at 240).

In support of his argument that the decision to terminate him was pretext, Curlee first points out that he only hit 100 points because of what was, at most, a paperwork and timeliness

error that could have been easily rectified—and which, indeed, he was entitled to the opportunity to rectify. He also notes that, between the September 12, 2016 absence and his termination, 5 points rolled off his record, taking him back down from 100 before it was even known if he had hit 100 at all. With regard to Lewis Brothers' decision not to rehire him, Curlee points out that rehiring was common and that the alleged workplace conflicts cited by Lewis Brothers as grounds not to rehire him had occurred long prior and had been addressed, at the time, without the need for further action. He points out, moreover, that any employee who has reached 100 points had, by definition, had a history of attendance issues. Finally, Curlee cites to evidence of his long service and satisfactory performance at Lewis Brothers as reasons suggesting that firing him for a short-lived, improperly imposed point overage and declining to rehire him due to long-stale workplace missteps were likely pretextual.

Lewis Brothers argues that, although Curlee relies on the fact that numerous other employees were rehired, he has not identified any specific employee who was similar to him in all relevant respects—meaning, presumably, an employee with a similar disciplinary history related to heated conflicts with coworkers. *See Johnson v. Interstate Brands Corp.*, 351 F. App'x 36, 41 (6th Cir. 2009) (noting that, in order to establish pretext via a comparator employee, a plaintiff must identify an employee "similarly situated in all relevant respects" (emphasis omitted)). That argument would be persuasive if Curlee were relying solely on the comparator employees to show pretext. Instead, however, he is merely relying on Lewis Brothers' past practices to confirm that rehiring post-termination was commonplace. He relies on other contextual factors to bolster the inference of pretext—for example, that his infractions were mostly long ago and the fact that Lewis Brothers arguably participated in manufacturing Curlee's

point overage in time to fire him before a large number of points rolled off his record and before they would be obligated to give him some 6–7 weeks off for cancer treatment.

What Curlee has presented is enough to allow a fact finder to conclude that Lewis Brothers' decisions were pretextual and that the company was impermissibly interfering in his exercise of his FMLA rights and/or retaliating against him for asserting those rights. Despite Lewis Brothers' insistence that it was merely interested in scrupulously following and enforcing its policies, Lewis Brothers skipped a required step that might well have saved Curlee's job. Curlee, moreover, had worked for the company for over a decade and a half, and, while he had made a few mistakes in his dealings with other employees, he had successfully moved beyond those mistakes and continued to be an effective employee. A reasonable juror could look at those facts and conclude that the most plausible account of what happened was that Lewis Brothers engineered Curlee's termination to prevent him from exercising his FMLA rights and/or retaliate against him for doing so. The court, accordingly, will deny Lewis Brothers' motion for summary judgment on Curlee's FMLA claims

**B. ADA and TDA**

In its initial Memorandum in support of its Motion for Summary Judgment, Lewis Brothers makes no arguments applicable to Curlee's ADA and TDA claims as he pleaded them. (Docket No. 23 at 18–20.) Curlee's Complaint makes abundantly clear that his disability-related claims concern disabilities arising out of his prostate cancer, which was diagnosed shortly before his termination in 2016. (Docket No. 1 ¶¶ 65, 78.) Lewis Brothers, however, insists that the court should consider his ADA and TDA claims as (1) based on Curlee's alleged depression and anxiety and (2) premised on discipline he received in 2011, 2012, and 2015, not on his termination in 2016. (Docket No. 23 at 18.) Lewis Brothers bases this argument entirely on

Curlee's testimony in brief snippets of his deposition. Curlee was asked if he considered himself to have been disabled at the time of his termination, and he said that he did, but due to his "depression [and] anxiety." He was then asked whether he had ever been discriminated against by Lewis Brothers with regard to his depression and anxiety, and he said that he had, specifically in the instances of the years-prior discipline involving his conflicts with other employees. (Docket No. 23-3 at 92–93.) Based solely on this exchange, Lewis Brothers seeks to redefine Curlee's claims and supplant the theory of the case he actually set forth in his Complaint.

Lewis Brothers then goes on to rely, in its initial briefing, entirely on arguments contingent on the assumption that the court will agree to recast Curlee's claims as Lewis Brothers would prefer. Lewis Brothers argues that Curlee's EEOC charge was untimely with regard to the 2011, 2012, and 2015 discipline—unsurprisingly, given that those incidents are not the subject matter of that charge. (Docket No. 23-1.) Lewis Brothers argues that Curlee's TDA claim was untimely filed with regard to the 2011, 2012, and 2015 discipline—again, unsurprisingly, given that the Complaint is not premised on those events. Finally, Lewis Brothers argues that discipline, in and of itself, is not an adverse employment action—an argument with no applicability to the actual adverse action Curlee has alleged, his termination. (*Id.* at 19–20.)

It is a "cardinal principle" of federal civil procedure that "a complaint defines the scope of the action." *Mirza v. The Neiman Marcus Grp., Inc.*, No. 06-CV-6484, 2009 WL 3824711, at *4 n.3 (N.D. Ill. Nov. 13, 2009) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1202 (3d ed. 2009 supp.); *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584 (7th Cir. 1993)). If Lewis Brothers had sought to rely on Curlee's deposition testimony to argue that Curlee had contradicted his Complaint on an issue of fact, it could have done so. *See* Fed. R. Evid. 613(b), 801(d)(2). Instead, however, Lewis Brothers has

18

chosen to argue that Curlee's deposition testimony should be treated as redefining the scope of his claims—in direct contravention of the language of the Complaint. (Docket No. 23 at 19.) There is no basis in the Rules of Civil Procedure for taking such a step. The claims in Curlee's Complaint regard cancer-related disabilities in 2016. All of the ADA and TDA arguments in Lewis Brothers' initial Memorandum, therefore, are directed at claims that are not before the court.

In its Reply, Lewis Brothers does raise arguments applicable to Curlee's actual ADA and TDA claims, while still arguing that Curlee should be forced to confine himself to the alternative claims that Lewis Brothers has invented for him. "[A]rguments raised for the first time in a reply brief are generally not considered because such a practice deprives the non-moving party of its opportunity to address the new arguments." *Cooper v. Shelby Cty., Tenn.*, No. 07-2283-STA-CGC, 2010 WL 3211677, at *3 (W.D. Tenn. Aug. 10, 2010). Curlee has had no opportunity to respond to Lewis Brothers' newly raised arguments, because Lewis Brothers made a conscious litigation decision to rely entirely on its unsupported argument that Curlee's deposition statements should be construed as altering the content of the claims he has pleaded.

Allowing Lewis Brothers to raise several pages of new arguments now, with no opportunity for rebuttal by Curlee, would unfairly deprive Curlee of the opportunity to raise all legal and factual arguments in support of his claims. While Curlee did seek to anticipate some of what Lewis Brothers might argue—arguing, for example, that he did present prima facie cases of disability discrimination under the ADA and TDA—he did not, nor could he have been expected to, preemptively respond to every issue Lewis Brothers might raise. It was Lewis Brothers' decision to put all its stock in the assumption the court would rewrite Curlee's claims. The court,

19

accordingly, will not grant summary judgment to Lewis Brothers on Curlee's TDA and ADA claims.

## IV. CONCLUSION

For the foregoing reasons, Lewis Brothers' Motion for Summary Judgment (Docket No. 22) will be denied.

An appropriate order will enter.

ENTER this 3rd day of April 2019.

_____
ALETA A. TRAUGER
United States District Judge